FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GREGORY DILLON | : |
| Plaintiff | : |
| V. | : Civil No. **304CV00231AWT** |
| CHRISTOPHER MORANO | : |
| Defendant | : FEBRUARY 9, 2004 |

## COMPLAINT

1.    This is a civil action for money damages to redress the deprivation by the defendant of rights secured to the plaintiff by the Constitution and laws of the United States and the State of Connecticut and is brought pursuant to 42 U.S.C. § 1983. The defendant subjected the plaintiff to a series of adverse employment actions in retaliation for plaintiff's exercise of rights protected by the First Amendment to the United States Constitution.

2.    Jurisdiction of this court is invoked under the provisions of §1331 and §1343 (4) of Title 28 of the United States Code. The plaintiff further invokes the supplemental jurisdiction of this court with respect to those causes of action asserted herein which arise under the Constitution and laws of the State of Connecticut.

3.    The plaintiff, Gregory Dillon, is an employee of the State of Connecticut and holds the position of Supervisory Inspector in the Office of the Chief State's Attorney of the State of Connecticut. The plaintiff is a twenty-five year veteran of law enforcement with a stellar

performance record in every capacity in which he has performed.

4. The defendant, Christopher Morano, is the Chief State's Attorney for the State of Connecticut. The defendant has overall administrative responsibility for the affairs of the Division of Criminal Justice of the State of Connecticut (hereafter "Division" or "DCJ"). The Division employs subordinate State's Attorneys, Supervisory State's Attorneys, Assistant State's Attorneys, Deputy Assistant State's Attorneys, Chief Inspectors, Supervisory Inspectors, Inspectors, Investigators, Housing Court Prosecutors, and numerous administrative and clerical personnel. The Division is charged with the enforcement of the criminal laws of the State of Connecticut and the investigation and prosecution of offenders.

5. The Office of the Chief State's Attorney ("OCSA") is a component of the Division of Criminal Justice with numerous prosecutors, inspectors, and administrative personnel assigned to duties in the OCSA under the overall supervision and direction of the defendant.

6. At all times relevant to this complaint, the defendant was acting under color or pretense of law, to wit: pursuant to the Constitution, statutes and regulations of the State of Connecticut. In his aforesaid capacity, the defendant has authority and control over state employees assigned to the OCSA, including decision-making with respect to hiring, discharge, discipline, promotion, demotion and assignment of personnel.

2

7.  The plaintiff commenced his career in law enforcement in 1976 with employment in the capacity of Special Deputy Sheriff in the New Haven County Sheriff Department. The plaintiff thereafter served as a police officer in the Department of Police Services in the Town of Branford and later as a Special Agent for the Federal Bureau of Investigation. He joined the OCSA in 1990 as an Inspector in its Economic Crime Unit. In 1993, the plaintiff served as an Inspector on the Fugitive Squad of the OCSA and in 1995 was promoted to the rank of Supervisory Inspector. As Supervisory Inspector, the plaintiff supervised, coordinated and conducted fugitive investigations which focused on identifying, locating and apprehending wanted felons. His supervisory responsibilities included budgeting, management and evaluation of subordinate inspectors and staff, and the training and outfitting of a high-risk tactical unit.

8.  At the time the plaintiff served as Supervisory Inspector in charge of the Fugitive Squad, the defendant was Deputy Chief State's Attorney, second-in-command of the Division and reported directly to then Chief State's Attorney John M. Bailey.

9.  As Supervisory Inspector in the Fugitive Squad, the plaintiff was assigned, along with five subordinate inspectors, to collaborate with other state law enforcement officers and agents from the Federal Bureau of Investigation ("FBI") in a joint state-federal fugitive task force during the period 1994 through 1996.

10.  During the summer of 1996, the plaintiff brought to the attention of the defendant and then Chief State's Attorney Bailey his belief that certain FBI agents assigned to the Task

3

Force had engaged in serious misconduct by the submitting, to judges of the United States District Court, arrest warrant applications containing fabricated information and knowingly false statements which were attributed to the plaintiff and his subordinates.

11. The plaintiff also presented to his superiors a notebook containing photocopies of arrest warrants and other documentary evidence which corroborated his allegations of official misconduct. The defendant, Christopher Morano, was involved in formulating the OCSA's response to plaintiff's allegations and communicating with FBI officials regarding the plaintiff's disclosures.

12. Former Chief State's Attorney Bailey responded to plaintiff's disclosures by initiating a series of retaliatory and punitive actions against the plaintiff. Bailey disbanded the plaintiff's squad, transferred the plaintiff to a far-away location in a remote area of the state, stripped the plaintiff of his supervisory duties and deprived the plaintiff of a promotion for which he had applied and was well-qualified.

13. In connection with the adverse employment actions taken against him, the plaintiff brought a civil action against former Chief State's Attorney John M. Bailey in the United States District Court for the District of Connecticut. The action, commenced on August 6, 1998, alleged that Chief State's Attorney Bailey, in taking the adverse actions against the plaintiff, violated the plaintiff's rights secured to him by the First Amendment to the United States Constitution. The action, captioned and docketed as <u>Gregory Dillon v. John M. Bailey,</u>

4

3:98cv01576 (JBA) (hereinafter "Dillon v Bailey") was fully prosecuted and tried to a jury in the United States District Court for the District of Connecticut in November of 1998.

14. In the course of jury trial proceedings in Dillon v Bailey, the defendant appeared as a witness in defense of the action. He was sworn and gave testimony under oath in a direct examination by an Assistant Attorney General for the State of Connecticut representing John M. Bailey. The defendant Morano offered testimony to jurors on the subject of one of the alleged adverse actions taken against the plaintiff by John M. Bailey, to wit: the denial to plaintiff of a promotion which was awarded to a competing candidate, one Inspector Charles Coffey. Defendant testified that it was he, and not John M. Bailey, who was the primary decision-maker with respect to the promotion denied to the plaintiff and awarded to Mr. Coffey. The defendant Morano's testimony in this regard was offered and used by John M. Bailey and his defense counsel for the purpose of arguing to jurors that John M. Bailey could not be held liable for the denial of the promotion as the testimony offered by Christopher Morano, if believed, indicated that plaintiff failed to meet his burden of proving that John M. Bailey was personally involved in and responsible for the denial of the promotion.

15. The credibility of defendant Morano's testimony in Dillon v Bailey was challenged in an extensive cross-examination before the jurors.

16. On November 25, 1998, the jurors in Dillon v Bailey deliberated and returned a verdict in favor of the plaintiff and against the defendant John M. Bailey. By way of a verdict

5

form with interrogatories, the jurors found against John M. Bailey on all causes of action including the cause alleging that he was personally responsible, and thus liable, for denying the plaintiff the promotion awarded to Mr. Coffey.

17. The jury's return of the aforesaid verdict evinced a wholesale discrediting and rejection by the eight-member jury of the sworn testimony of Christopher Morano.

18. By its verdict, the jury in Dillon v Bailey, not only awarded the plaintiff compensatory damages but assessed punitive damages against Bailey upon its finding that Bailey had acted willfully and maliciously in violating the constitutional rights of the plaintiff. Judgment entered in the District Court in favor of the plaintiff and against the defendant in accordance with the jury's verdict and findings. The judgment remains on the public record.

19. The trial proceedings, verdict and judgment in Dillon v Bailey generated wide-spread media coverage, newspaper editorials and letters to editors, all of which were highly critical of the defendant Bailey and embarrassing to the DCJ and OCSA. There were public calls, including those from editors of major newspapers, for the resignation or termination of the Chief State's Attorney.

20. On or about October 2, 2002, the defendant Christopher Morano became Acting Chief State's Attorney. The defendant Morano thus assumed all of the authority and powers of the office of Chief State's Attorney.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

21. On or about December 23, 2002, Chief State's Attorney Bailey retired from state service and the defendant Christopher Morano sought and received appointment to the position of Chief State's Attorney by the State's Criminal Justice Commission for a term of five years, which term is renewable upon its expiration at the discretion of the members of the Criminal Justice Commission.

22. Exercising control over the affairs of the Division and the OCSA as Acting Chief State's Attorney and later Chief State's Attorney, the defendant Morano embarked on a series of adverse, punitive and demeaning actions against the plaintiff to punish plaintiff and retaliate against him on account of plaintiff's initial disclosures of FBI agent misconduct, his commencement of the aforesaid District Court action, his prosecution of that action and his success in prevailing in it.

23. The defendant engaged in the following retaliatory conduct and adverse actions against the plaintiff:

   A. Defendant interfered and attempted to interfere with performance reviews issued to plaintiff by his immediate supervisor by exercising undue and improper influence over the content of the reviews and attempting to intimidate plaintiff's reviewing supervisor into altering the reviews to render them less favorable.

   B. Defendant reduced in number the Inspectors and other staff necessary to plaintiff's proper performance of his duties as a Supervisory Inspector in the

7

Division's Gang and Continuing Criminal Activities Bureau and reallocated personnel to other bureaus, leaving the plaintiff unable to carry out the duties and statutory mandates of the Gang and Continuing Criminal Activities Bureau. Following the conclusion of proceedings in Dillon v. Bailey, the plaintiff was reassigned as a Supervisory Inspector to the Gang and Continuing Criminal Activities Bureau which then had a staff of four Inspectors, a Supervisory Assistant State's attorney, three prosecutors, two secretaries and a paralegal. Defendant Morano reduced the personnel in this Bureau through a series of transfers until the Bureau consisted of the plaintiff, one Inspector, two prosecutors, and one part-time secretary. The defendant sought to deprive the plaintiff of the personnel and resources needed to carry out his job functions and thus forced the plaintiff to perform the duties of a subordinate Inspector in order to accomplish basic tasks which would otherwise be handled by the plaintiff's subordinates.

C. The defendant reallocated files, investigations and other responsibilities away from the plaintiff's Bureau to another unit, despite the fact that plaintiff's Bureau was created by the General Assembly and mandated to handle such matters as fraud and corruption. Upon disbanding the Gang and Continuing Criminal Activities Bureau, defendant created a new unit, the "Public Integrity Bureau",

8

consisting of a Supervisory Inspector, a Supervisory Assistant State's Attorney, four inspectors, a prosecutor, and a secretary. The defendant orchestrated this reorganization with the aim and design of reducing the plaintiff's stature in law enforcement and marginalizing him in the OCSA , the Division of Criminal Justice and the law enforcement community at large.

D. The defendant maliciously assigned to plaintiff an office which was the least desirable and the least conducive to the proper performance of plaintiff's job duties. In the environment of the OCSA, headquartered in a large three-story state office building in Rocky Hill, one's office assignment is considered to denote one's position and value to the organization. By virtue of the plaintiff's title, seniority and responsibilities, the plaintiff would ordinarily be provided a private office with sufficient space and amenities commensurate with his status. The defendant assigned the plaintiff to occupy a former coffee-break room, tiny in size as compared to other available offices, and without windows. All supervisory inspectors, including four such supervisors junior to the plaintiff, were afforded spacious private offices with windows. New hires, including unpaid temporary interns, were afforded private offices with windows. Defendant further arranged for another Inspector to share the plaintiff's office, causing the plaintiff to work in a small, cramped and dismal environment in a

9

       location disconnected from the activities of plaintiff's unit, while the activities of other Bureaus were arranged in proximity. Defendant by this conduct sought to demean the plaintiff and send a message to OCSA staff that plaintiff was disfavored by him and the agency and thus should be shunned.

E.    Although as a supervisor, plaintiff traditionally would be invited to take part in weekly meetings of top staff and administrative personnel, the defendant excluded the plaintiff from these meetings over which he presided and encouraged others, directly and tacitly, to exclude the plaintiff from such meetings, thus further demeaning the plaintiff in the eyes of OCSA and Division staff and sending a message that plaintiff was disfavored in the agency and should be avoided and shunned.

F.    Upon learning of an upcoming vacancy for the position of Chief Inspector, the plaintiff wrote to the defendant and applied for promotion to that position. Plaintiff was highly qualified to perform the duties of a Chief Inspector and was deserving of the promotion, having earned it by many years of excellent service, the development of expertise and leadership skills, and his work record which was unblemished and marked by outstanding performance reviews, commendations and numerous other distinctions. In response to plaintiff's expressed interest in and desire for the promotion, the defendant lied to the

10

plaintiff, telling plaintiff that no such vacancy existed and there were no plans to appoint a new Chief Inspector. Thus, plaintiff was not granted an interview nor allowed to proceed further to establish his entitlement to the promotion. Within days of defendant's false representations to the plaintiff, defendant hired, as the new Chief Inspector in the OCSA, one Larry Skinner - an outside candidate with less supervisory experience and inferior qualifications and who had never before been employed in the OCSA.

24. The defendant set up and organized a new bureau within the OCSA called the Public Integrity Bureau with those officials assigned to work in it responsible for investigating and preparing cases for prosecution involving official corruption. Responsibility for such matters was typically the province of the Gang & Continuing Activities Bureau consistent with the state legislature's statutory direction that corruption shall be investigated and prosecuted by the Gang & Continuing Activities Bureau. Defendant's reorganization and setting up of a competing bureau was further motivated by his desire to diminish the plaintiff's role in the Gang & Continuing Criminal Activities Bureau while expanding the role of the Statewide Prosecution Bureau and in doing so, and by design, further reduced the plaintiff's stature and relegated him to less desirable and less prestigious law enforcement duties.

25. In a further attempt to punish and retaliate against the plaintiff, the defendant, in July 2003, reassigned the plaintiff to duty in the Elder Abuse Unit, a component of a new bureau

11

called "Elder Services". The plaintiff was thus reassigned to investigate cases involving the abuse of elderly persons. While the protection of the elderly from abuse is an important goal, within the environment of the OCSA, it is generally considered to be the least desirable assignment and, for the plaintiff, an assignment which is not commensurate with his long and established record of supervising investigations in high-profile matters of corruption, criminal enterprises and serious felony offenses. The plaintiff was forced to accept reassignment to the Elderly Abuse Unit since if he did not, defendant intended to eliminate the plaintiff's duties and responsibilities as a Supervisory Inspector and relegate him to Inspector-level duties.

26. In a further act designed to punish and humiliate the plaintiff, the defendant, in addition to decimating the plaintiff's bureau and reassigning him to less desirable work in the Elder Abuse Unit, added to plaintiff's new responsibilities the obligation to reorganize and manage the evidence room at the OCSA. Such duties as organizing and managing the records and activities of the evidence room have never before been assigned to a Supervisory Inspector, or other officer of plaintiff's background and stature. Such duties are normally assigned to low-level or mid-level clerical staff. The defendant's assignment of plaintiff to responsibility for the evidence room was a malicious act designed to humiliate the plaintiff, hold him up to ridicule within his work community and send a clear message to OCSA staff and the law enforcement community in general that the plaintiff is unwanted, is not valued and has fallen out of favor with the state's criminal justice administration.

12

27. All of the aforesaid adverse actions were designed to retaliate against the plaintiff on account of his aforesaid expressive activity and prosecution of the civil action, expression and activities which are absolutely protected by the first amendment to the United States Constitution and by the Constitution of the State of Connecticut.

28. In consequence of defendant's unlawful acts and omissions as aforedescribed, the plaintiff has suffered loss of income, loss of benefits, damage to his career and career opportunities, reputational injury, public embarrassment and severe emotional distress.

29. All of the acts and omissions of the defendant as aforedescribed were intentional, extreme and outrageous and were designed to cause the plaintiff to suffer severe emotional distress. As a direct and proximate result of defendant's conduct the plaintiff in fact suffered severe emotional distress.

WHEREFORE, the plaintiff prays for judgment against the defendant and relief as follows:

    a. Compensatory damages in an amount which a jury shall determine to be just and reasonable;

    b. Punitive damages in an amount which a jury shall determine to be just and reasonable;

    c. Attorney's fees and the costs of this action; and

    d. Any such further relief as law or equity may provide.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

THE PLAINTIFF
GREGORY B. DILLON

BY: ______________________
KAREN LEE TORRE
Federal Bar No. ct01707
51 Elm Street, Suite 307
New Haven, CT 06510
(203) 865-5541

His Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GREGORY DILLON          :
                        :
        Plaintiff       :
                        :
V.                      :   Civil No.
                        :
CHRISTOPHER MORANO      :
                        :   FEBRUARY 9, 2004
        Defendant       :

## DEMAND FOR JURY TRIAL

The plaintiff hereby requests a trial by jury as to all issues.

                                    THE PLAINTIFF
                                    GREGORY DILLON

                                    BY _____
                                    KAREN LEE TORRE
                                    Federal Bar No. ct01707
                                    51 Elm Street
                                    Suite 307
                                    New Haven, CT 06510
                                    (203) 865-5541

                                    His Attorney

15